tervenor from its start in business; that their purchases were all along bought on the usual credit of from thirty to sixty days; that the firm had a continuing credit with intervenor; that the order for the goods in controversy was solicited by intervenor's agent at the firm's store in his usual way of getting orders; that Mr. Gobrecht gave the order himself; that no questions were asked him about the solvency of the firm; that when he placed the order Mr. Gobrecht believed the firm was solvent—at least, he didn't know it was insolvent; that he purchased the goods on the usual time credit, and that he expected and intended that the firm should pay for them at the maturity of the bill; that the firm had on hand a stock of goods which cost them $11,000, and that there were book accounts owing to them in the amount of $4,000; that McDonald had the management of the office, while he, Gobrecht, was the outside traveling man; that dissensions had arisen between McD. and the other members of the firm, through which they were compelled to buy McD. out, and that then he discovered when forced to buy McD. out that the firm was insolvent; that at the time of the receivership their indebtedness was $24,100. The original contributions of capital were: G., $10,000; McD., $1,800, and Cole, $1,000. The foregoing is about the substance of all of the oral evidence offered.

Standing on this evidence alone and following as closely as I could the reasoning of the opinion in the case of Talcott v. Henderson, 31 Ohio St., 162, my inclination was that a case of wilful intention not to pay had not been made out, and, hence, that intervenor had not parted with its goods through fraud on the part of the firm. Mr. G. was perfectly open and frank on the witness stand, and I am confident perfectly honest in his statements. There are some obscurities in his testimony that required a reference to the pleadings to clear up. For instance, he testified to dissensions with McD. and to the necessity of buying him out, but he did not state, possibly because not asked, how much it required to buy him out. But he does state that when forced to buy McD. out, he, G. then discovered the firm to be insolvent, but he does not state at what date that was.

Now, if we refer to the petition, which is signed and sworn to by both G. and C., and which is not denied by any of the parties to the case—thus presenting a clear instance of an admission of record —we find it averred that since "July 6, 1897, he (McD.) abandoned all active participation in the conduct of said business and went elsewhere * * * but retaining his connection with said partnership. Also, since the date last named (i. e. July 6, 1897), he has withdrawn from the said firm an amount equal to his capital in the firm, the effect of which

has been to seriously cripple the resources of the firm and to render it at this time unable to meet its obligations due and about to become due." This averment necessarily shows that all of the members of the firm from July 6, 1897, to January 4, 1898, thus overlapping the date of intervenor's sale, were cognizant that the firm was being crippled by the withdrawal of Mr. McD.'s capital, and was being incapacitated from meeting its maturing obligations.

Now, it is not a forced deduction at all to say that if they were not able to meet maturing indebtedness, they would not be able to meet any new indebtedness, and that they knew that fact. There were only twenty days elapsing from intervenor's sale to the filing of the receivership petition, and it is not at all probable, in view of the allegations of the petition, that all of the trouble, and the firm's knowledge of it, culminated within those twenty days. The more reasonable view is, that the firm knew of their impending disaster all along from July 6, 1897. Hence, it seems to me, that the deduction is a fair one that at the time Gobrecht ordered the goods in controversy from intervenor's agent the firm had "no reasonable expectation of being able to pay for them;" that, under Talcott v. Henderson, is equivalent to an intention not to pay. As a consequence, the intervenor would have been entitled to a return of the specific goods; they having been converted by the receiver herein, he is entitled to their proceeds; and an order is allowed to that effect.

Jacob Shroder, for the Intervenor.
Campbell, Bates, ClenDening & Meyer, for the Second National Bank.

---

(Superior Court of Cincinnati.)
Special Term.
WM. GOODALL v. CITY.

---

Where the improvement of a street is not properly authorized by the city because of a failure to obtain the requisite number of signatures, no additional liability attaches to abutting property owners who did sign the petition for the improvement in which there was incorporated a contract to indemnify the city from losses on account of non-signers.

---

Suit to enjoin a street assessment in excess of 25 per cent. of value of lot.

DEMPSEY, J.

It appears that the improvement (McMillan street from Kibby street to Highland avenue) was made by petition. There were several petitions signed by various owners, some of which had incorporated within them a provision that in consideration of the city's making said improvement and building an iron

bridge over Hunt street, the petitioners agreed with each other and with the city, and jointly and severally bound themselves to make good to the city any deficiency in the collectibility of the assessment caused by insufficiency of values of property of those not signing this petition. In other petitions the foregoing provision did not appear. The city claims that it built said street and bridge in accordance with said petitions; that there have been deficiencies in the collectibility of assessments caused by insufficiency of values of property of those not signing said petition, and that the amount of said deficiencies exceeds the amount of the assessment against Goodall's property for said improvement. The city prays that if any reduction shall be made in said assessment there may be offset against said reduction the amount of plaintiff's share of said deficiency.

It is admitted that three-fourths in number of the property holders did not sign said petitions, and that the value of the property is but $9.00 per front foot. The assessment is $11.09 per front foot. The record evidence in the case shows that the improvement was at first refused because three-fourths of the property owners did not sign the petitions; that the petitions were sent back for new signatures and returned, and that the city engineer then reported that the necessary signatures had been obtained.

The course of conduct pursued by the city in connection with the petitions shows that it was the understanding and intention of both the city and signers that this work should not be attempted until the necessary legal number of signatures had been obtained. The contract at the end of the petition is to be read in connection with this practical construction placed upon the petition itself by the city—and so read, the obligation to pay assumed by Goodall was conditional upon the work being properly authorized on the part of the city. The work on the part of the city was not properly authorized because there was in fact a failure to obtain the requisite number of signatures; hence, no liability on the part of Goodall arose under the contract to indemnify the city against the losses of non-signers.

Decree for plaintiff.

F. C. Ampt for plaintiff.

Corporation Counsel, contra

---

(Hamilton Co., Court of Common Pleas.)

GEORGE GUCKENBERGER, a taxpayer, etc., on behalf of said corporation and all other taxpayers., v. JULIUS DEXTER et al., board of trustees of the Sinking Fund of Cincinnati.

---

The contract set forth in the decision between the Board of Sinking Fund Com-

[COPYRIGHT, 1898, BY CARL G. JAHN.]

missioners of Cincinnati with Roberts & Co. of New York, for refunding the Southern R. R. bonds of that city, is void.

While courts will not control the judgment or discretion of any public officer in respect to any matter submitted to him by law; yet the exercise of this discretion is still limited by legal construction to what is known as a sound and legal discretion, excluding all arbitrary capricious proceedings. And equity will always interfere to prevent municipalities or their agents from assuming powers relating to property and funds entrusted to them to be exercised in conformity with law for the benefit of the municipality or its inhabitants.

Powers conferred upon municipalities and their agents with respect to the corporate funds and corporate property are public trusts cognizable in a court of equity.

---

SPIEGEL, J.

On the 15th day of June, 1898, the board of trustees of the sinking fund of Cincinnati, acting on behalf of the city of Cincinnati, entered into a contract with Roberts & Co., of New York, which reads as follows:

"Agreement made this 15th day of June, 1898, between Roberts & Co., a corporation organized under the laws of the state of New York, and doing business in the city of New York, in the said state (hereinafter called the 'bankers'), parties of the first part, and the trustees of the sinking fund of the city of Cincinnati, in the state of Ohio (hereinafter called the 'trustees'), parties of the second part:

"Whereas, There are now outstanding approximately the following amounts of the following issues of bonds of the city of Cincinnati (hereinafter called the outstanding bonds), that is to say: Cincinnati Southern R. R. 7 per cent. bonds, maturing in 1902, say $494, 000; Cincinnati Southern R. R. 7 3-10 per cent. bonds, maturing in 1906, say $7,644,000; Cincinnati Southern R. R. 6 per cent. bonds, maturing in 1906, say $2,890.000 Cincinnati Southern 7 3-10 per cent. bonds, maturing in 1906, say $1,860,000; Cincinnati Southern 6 per cent. bonds, maturing in 1909, say $895,000; funding floating debt 7 per cent. bonds, maturing in 1904, say $996,000; total amount outstanding estimated at $15,610,000 and,

"Whereas, The trustees, by virtue of the powers now vested in them, and legislation hereafter to be had amending or supplementing the same, propose to refund the outstanding balances of the issues aforesaid, whatever the same may be in Cincinnati consolidated sinking fund bonds (hereinafter called 'refunding bonds') of the character described in sections 2729a and 2729b of the Revised Statutes of Ohio, or authorized by subsequent legislation; and,